J-S76015-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| J.M., | IN THE SUPERIOR COURT |
| | OF |
| | PENNSYLVANIA |
| Appellant | |
| v. | |
| M.M., | |
| Appellee | No. 914 WDA 2018 |

Appeal from the Order Dated May 25, 2018
In the Court of Common Pleas of Allegheny County
Family Court at No(s): FD-15-005302-001

BEFORE:  BENDER, P.J.E., KUNSELMAN, J., and MURRAY, J.

MEMORANDUM BY BENDER, P.J.E.:                **FILED FEBRUARY 22, 2019**

J.M. ("Mother") appeals from the custody order dated May 25, 2018, that awarded M.M. ("Father") sole legal custody of A.B. (born in April of 2005), J.M. (born in April of 2007), and S.M. (born in September of 2009) (collectively "Children").  The May 25th order also awarded Father primary physical custody of the Children and partial physical custody to Mother.[1]  After review, we affirm.

The scope and standard of review in custody matters is as follows:

[T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it.  ...  However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination.  ...  Thus, an appellate court is

_____

[1] Both Mother and Father filed *pro se* briefs with this Court.

empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

*R.M.G., Jr. v. F.M.G.*, 986 A.2d 1234, 1237 (Pa. Super. 2009) (quoting *Bovard v. Baker*, 775 A.2d 835, 838 (Pa. Super. 2001)). Moreover,

> on issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.
>
> The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

*R.M.G., Jr., supra* at 1237 (internal citations omitted). The test is whether the evidence of record supports the trial court's conclusions. *Ketterer v. Seifert*, 902 A.2d 533, 539 (Pa. Super. 2006).

*A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014).

Mother raises the following six issues, some of which include numerous sub-issues, for our review:

1. The [j]udge erred by awarding [Father] sole legal custody when the weight of the evidence under the factors of custody favored Mother, including but not limited to the subparts in paragraph two below.

2. The [j]udge erred by awarding Father primary physical custody when the weight of the evidence under the factors for custody favored Mother, including but not limited to:

   a. by finding that Mother discourages a relationship between the Father and [] Children when the parties

- 2 -

were practicing shared legal custody and [] Children demonstrated strong bonds and positive relationships with both parents;

b. by finding that Mother performed most of the parental duties but weighing this factor in favor of Father, anticipating that he is capable of performing the same;

c. by first finding that the factor of stability was not pertinent in this case except for later inappropriately weighing the factor against Mother for school absences;

d. by giving Father school choice authority under circumstances that made Woodland Hills not in the best interest of [] Children;

e. by not considering the well-reasoned preferences of all or any of [] Children about the physical custody schedule; …

f. by finding that Mother attempts to turn [] Children away from Father when there was insufficient evidence of the same;

g. by finding that, when it come[s] to the question of who is more likely to maintain a loving, stable, consistent and nurturing relationship for [] Children's emotional needs, both parties fail but later weighs this factor in favor of Father despite acknowledging that Mother cares for all their needs and that Father denies their needs if he doesn't have the exact same view as Mother[;]

h. by finding that Mother is the heavier source of conflict despite the weight of the evidence favoring a finding against Father and despite finding that Father does not compromise with health care and education providers and fails to provide for [] Children in those areas, those areas being a source of conflict.

3. The judge erred by creating a custody Order that divests Mother [of] her parental role without substantive and sufficient evidence that such is in the best interest of [] Children, including but not limited to:

a. by ordering that Mother is prohibited from bringing any concerns to the attention of [] Children's school and being prohibited from contacting the school without Father's authorization;

b. by ordering that Mother is prohibited from attending all parent teacher conferences, open houses, and other regularly scheduled school meetings and activities unless authorized by Father and by requiring Mother to leave if there is an issue at one of these events irrespective of the circumstances;

c. by ordering that only Father can schedule and attend routine and specialist medical appointments unless Mother is authorized by Father to attend;

d. by ordering that Mother cannot speak to any medical or education providers if Mother thinks there is an issue unless Father authorizes the same[,] which is particularly egregious when the [c]ourt found that Mother had the leading role in [] Children's healthcare and education path;

e. by requiring Mother to pay for all activities agreed upon by the parties if Father merely asserts he cannot afford the same;

f. by reducing Mother's physical custody time to five nights every two weeks when the parties equally shared physical custody;

g. by instructing Father to give reasonable good faith effort at consideration of Mother's opinion when Father demonstrated that his choices were against [] Children's interest simply because Mother asserted the same. Additionally, this provision is too subjective and not enforceable or practical in application for Mother to have any parental role in [] Children's lives;

h. by limiting communication between the Mother and [] Children during Father's custodial time when Mother and [] Children enjoyed regular contact and doing so despite even Father not wanting communication limited;

i. by sacrificing Mother's holiday time for Father's need for holiday time without real reason;

j. by unlawfully limiting Mother's ability to contact [] Children's medical and education providers solely for the purpose of obtaining medical records;

k. by failing to recognize and account for the close and bonded relationship of [] Children to their Mother.

4. The [j]udge erroneously premised her Order upon "testimony from all custody related motions" because there is no "testimony" provided in motions court as such is not a fact[-]finding

proceeding unless the parties were sworn in and proper procedure was followed.

5. The [j]udge erroneously failed to set forth what specific details of the "testimony from all custody related motions" she relied upon when rendering her decision.

6. The [j]udge committed errors through various evidentiary rulings that cannot be specifically identified at the time this statement is filed due to [] Children's Fast Track requirement that the statement be filed with the Notice of Appeal.

Mother's brief at 8-12.[2]

Here, in its opinion, the trial court set forth an extensive, factual and procedural history of this case and included information relating to the testimony of witnesses presented at trial. In addition, the trial court discussed and applied the custody factors contained in 23 Pa.C.S. § 5328. The court

_____

[2] Mother's Statement of the Questions Involved does not comply with Pa.R.A.P. 2116 in that the issues are not concisely expressed without unnecessary detail. Mother also overlooks the explanation contained in Rule 2116 that provides that the statement "will be deemed to include every subsidiary question fairly comprised therein." Moreover, the argument section of Mother's brief does not comply with Pa.R.A.P. 2119(a), which states:

The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part— in distinctive type or in type distinctively displayed—the particular point treated therein, followed by such discussion and citations of authorities as are deemed pertinent.

Mother has neither divided the fifty-page argument section of her brief to match the list of questions she raises, nor has she included any citations to authorities to support her arguments. The only citations included in her brief are located in her statement of the scope/standard of review. In reviewing Mother's appeal, we have overlooked these omissions/errors and will not quash this appeal, although it is within our power to do so. *See First Union Mortgage Corp. v. Frempong*, 744 A.2d 327, 333 (Pa. Super. 1999). Rather, due to the certified record and the trial court's comprehensive opinion, we conclude that the issues are reviewable.

also explained its reasons for the March 25, 2018 order and addressed the issues Mother raised in her concise statement of errors complained of on appeal.

It is apparent that Mother's arguments are essentially requesting that this Court re-find facts and re-weigh the evidence. However, our standard of review requires that we "accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations." *C.R.F., III v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012). Rather, we "may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable finds of the trial court." *E.D. v. M.P.*, 33 A.3d 73, 76 (Pa. Super. 2011).

We have reviewed the certified record, Mother's brief, the applicable law, and the thorough, well-reasoned opinion authored by the Honorable Eleanor L. Bush of the Court of Common Pleas of Allegheny County, dated September 14, 2018. We conclude that Judge Bush's extensive opinion properly disposes of the issues presented by Mother in this appeal. Accordingly, we adopt the trial court's opinion as our own and affirm the custody order on that basis.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/22/2019

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY,
PENNSYLVANIA
FAMILY DIVISION

| | |
|---|---|
| J.M.,<br><br>Appellant,<br><br>v.<br><br>M.M.,<br><br>Appellee. | **CHILDREN'S FAST TRACK**<br><br>FD 15-005302-001<br><br>914 WDA 2018<br><br>**OPINION** |

## OPINION

Bush, J.                                                                 September 14, 2018

A.M., S.M., and J.M., (collectively, the "Children") are the children of J.M.

("Mother") and M.M. ("Father"). Father filed a custody complaint on January 6,

2016, and Mother filed a counterclaim on March 9, 2016 and an amended

counterclaim on March 8, 2017. The Court conducted a hearing in the matter on

April 4, 2018, April 13, 2018, April 23, 2018, and May 15, 2018. During the

hearing, the Court heard testimony from the following witnesses: (1) Father's

employee and close friend; (2) the superintendent of the Children's school district;

(3) S.M.'s baseball coach; (4) S.M.'s and J.M.'s soccer coach; (5) Dr. Douglas

Della Toffalo, Ph.D.; (6) Father; (7) Dr. Manikum Moodley; (8) the Children's

former school counselor; (9) J.M.'s baseball coach; (10) J.M.'s kindergarten

TJO                    1

teacher; (11) an education specialist with the County Department of Human Services; (12) maternal aunt; (13) paternal aunt; (14) Mother; and (15) the practice manager of the Children's pediatrician's office. The Court also interviewed all three of the Children. The Court admitted 173 of Father's exhibits, 51 of Mother's exhibits, and Court Exhibits 1 and 2 into the record.

The parties completed all testimony on May 15, 2018. On May 17, 2018, with both parties present, the Court announced its decision and discussed its findings related to the 16 custody factors that the court must consider pursuant to the Domestic Relations Code.[1] The Court awarded primary physical custody of the Children to Father and partial physical custody to Mother. The Court awarded sole legal custody to Father. The Court subsequently issued its final order on May 25, 2018. The order was entered on the docket on May 29, 2018. On June 22, 2018, Mother timely filed her Notice of Appeal and Concise Statement of Matters Complained of on Appeal ("Concise Statement"). Mother's Concise Statement lists six comprehensive errors, some with as many as eleven sub-errors, and consequently will not be re-stated here.

## II. Factual Background

The following background summarizes key facts established during the course of the proceedings:

---

[1] Tr. 7-24 (May 17, 2018).

TJO 2

The parties are the parents of three minor children. At the conclusion of the hearing, the Children were ages 13, 11, and 8. Prior to the parties' separation in early 2016, the parties and the Children lived together as an intact family. While the parties were together, Father worked to support the family financially and Mother stayed home to care for the Children. Mother was primarily responsible for the Children's educational and medical needs. Following the parties' separation, Father sought a more active role in the Children's education, health care, and extracurricular activities. Mother has rebuffed Father's parenting attempts at every turn and has actively tried to exclude him from participating in decisions regarding the Children's lives.

Mother has been completely unwilling to accept Father's role as a parent when dealing with educational issues. The Children all previously attended Shadyside Academy, but were unable to remain enrolled for financial reasons. Both parties live in the Woodland Hills School District, so Father enrolled the Children there when it became clear private school was no longer an option. The Children were set to begin school at Woodland Hills in the 2016-2017 school year. Mother refused to take the Children to school[2] and Father was forced to file an

---

[2] When Father asked Mother if she would be taking the Children to school at the beginning of the school year, Mother responded: "My children will never go to [Woodland Hills]. Stop harassing me and stop torturing the children. You are a soulless scumbag." *See* Father's Exhibit 35.

TJO          3

Emergency Motion to resolve the matter.[3] Following the Children's transition to the new school, Mother's communications with Father and the school sought to diminish Father's parental role even further.[4] Mother's behavior became particularly egregious when she unilaterally arranged to have two of the Children moved up a grade level without including Father in the discussions or decision.[5] Furthermore, on the final day of the custody hearing, Mother revealed that while the litigation was proceeding, she submitted applications for two of the Children to attend a different school without informing Father.[6] Father was not aware of the Children's application until Mother sought to admit an exhibit documenting their acceptance.[7]

Mother has similarly been unwilling to accept Father's parental role when dealing with medical issues. Post-separation, Mother made a practice of not informing Father of the Children's medical appointments until after they occurred, or on such short notice that Father was unable to make arrangements to attend.[8]

---

[3] *See* September 2, 2016 Order of Court. School attendance during Mother's custody time has remained an issue.

[4] *See e.g.,* Father's Exhibit 39 (In response to Father sharing with Mother a benign communication from S.M.'s teacher, Mother responds "Why are you having conversations with teachers that don't involve me. I have always been the main point person for all school issues! And I'll continue to be the main point person."); Father's Exhibit 55 (Mother criticizing Father's parenting in an email to the Children's principal, superintendent, and other educator); Father's Exhibit 76 (Mother again criticizing Father in an email to a teacher, principal, and others).

[5] Tr. 272-274 (April 4, 2018).

[6] Tr. 68-70 (May 15, 2018).

[7] *See* Mother's Exhibit V.

[8] *See e.g.,* Tr. 33-40 (April 13, 2018), Father's Exhibits 94-98.

TJO 4

When Father would attend the Children's appointments, Mother would swear at Father in front of the health professionals and others in the office.[9]

Mother's efforts to exclude Father from the Children's lives have created conflict with the Children's educators, physicians, and coaches. The school district deemed it necessary to implement a special communication policy for the family because the Children's teachers felt intimidated and did not wish to have any direct communication with Mother.[10] Following an incident at the orthodontist where Mother screamed at Father for asking the orthodontist questions about the proposed treatment plan, the orthodontist's office sent Mother an email informing her that her excessive use of profanity was unacceptable and that if she could not control her language in the presence of minors, the family would need to find a different orthodontist.[11] On the final day of the custody hearing, the parties received a message from the Children's pediatrician threatening to dismiss the family from the practice, specifically citing correspondence involving "a considerable amount of chicanery ... as well as incredible amounts of profanity and threatening language."[12] One of the Children's coaches testified to Mother's

---

[9] See Father's Exhibits 120-122, 125.
[10] Tr. 74 (April 4, 2018).
[11] See Tr. 68-69 (April 13, 2018); Mother's Exhibit K-6.
[12] Mother's Exhibit X.

TJO

5

behavior at sporting events and said it would be a reason he would consider not picking the Child for future teams.[13]

Conversely, the evidence showed that Father has ceaselessly attempted to co-parent with Mother. Father attempted to discuss educational, athletic, and extracurricular matters with Mother. Unlike Mother, who could not think of a single time she compromised with Father, Father was able to name numerous areas where he listened to Mother's opinion and chose to support her viewpoint.[14]

It was against this background that the Court evaluated each party's request for primary physical custody and sole legal custody of the Children. .

## III. Standard of Review

When a trial court orders a form of custody, the best interests of the children are paramount. To determine the children's best interests, the trial court must consider the sixteen factors enumerated in 23 Pa. C.S. § 5328(a).

Then, when reviewing the trial court's custody decision, the Superior Court applies the following standard of review:

> In reviewing a custody order, ... [w]e must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings.

---

[13] Tr. 114-115 (April 4, 2018).
[14] Tr. 140-142 (May 15, 2018).

6

Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.[15]

## IV. Discussion

### A. The record supports the Court's award of sole legal and primary physical custody to Father.

As required by the Domestic Relations Code, the Court reached its determination regarding the Children's best interests by considering each of the 16 custody factors delineated in 23 Pa. C.S. § 5328(a). Mother raises so many issues on appeal that they amount to an overall assertion that the Court's findings and conclusions were not supported by the evidence. Therefore, before addressing separate, specific asserted errors, the Court will begin by summarizing and discussing its findings regarding each of the custody factors.

The Court weighed six of the custody factors in Father's favor and weighed only one of the custody factors in Mother's favor. The Court found all the remaining factors either not applicable, neutral between the parties, or slightly in Father's favor, but not significantly so. The Court did not find this a close case. The Court found the evidence driving the Court's decision to be overwhelming in its extent. The Court summarizes its analysis here, but does not attempt to identify

---

[15] *V.B. v. J.E.B.*, 55 A.3d 1193, 1197 (Pa. Super. 2012) (citations omitted).

7



all of the facts of record that support its decision. The transcript of the hearing and admitted exhibits include additional support for the Court's findings.

The Court weighed Factor 1 in Father's favor. At the time of the hearing, Parents were equally sharing physical custody of the Children. Although the Court recognized that Mother does not prevent the Children from spending time in Father's physical custody, she actively discourages their relationship with Father by refusing to accept his role as a parent. Testimony and exhibits from multiple sources support this conclusion.

For example, in Mother's testimony, she minimized Father's role as a parent and instead referred to him as "a great playmate." When communicating with the Children's school, Mother referred to Father as the Children's "frat brother" on multiple occasions.[16] Mother denigrated Father in front of the Children and the Children's pediatrician at routine office visits.[17] Furthermore, Father presented evidence that Mother would condition Father's phone contact with the Children upon him providing her with money.[18]

---

[16] *See* Father's Exhibit 55 and Father's Exhibit 76.

[17] *See* Father's Exhibit 120 (noting at the visit, "Mom accusing Dad of trying to piss her off by 'dressing like a f**king slob'" and "Mom threatening to call the police without any provocation and said she 'would like to 302 [Father's] a**'").

[18] *See* Father's Exhibits 29, 159; For additional examples of Mother's behavior, *See also,* Father's Exhibits 76, 108, 154; Tr. 68 (May 15, 2018) (A.M. describing Mother's negative statements about Father).



8

The Court found Factors 2 and 2.1 not applicable. Mother does not challenge these findings.

The Court weighed Factor 3 in Mother's favor. It was undisputed that historically, Mother took the lead in fulfilling the full range of parental duties on behalf of the Children, including health care, educational decisions, and addressing the Children's respective special needs. The Court did observe that Father is both capable of performing these duties and has made many efforts to participate in fulfilling these duties since Parents separated,[19] but that observation does not diminish the Court's having weighed the factor in Mother's favor.

The Court weighed Factor 4 in Father's favor. As the Court explained on the record, because Parents reside near each other and were sharing custody equally at the time of the hearing, the Children were able to maintain significant continuity and stability in a shared custody arrangement. However, Mother adamantly opposed the Children's enrollment in the Woodland Hills School District and did not ensure their consistent attendance. Mother's failures to send the Children to school became less frequent in the 2017-18 school year, but the record reflected continued instances of Mother removing the Children from school or not sending them on days they should have attended. As the Court stated to the

---

[19] In addition, the Court points out that the parties have been exercising shared custody since separation. Thus, Father has been responsible for the Children's daily needs 50% of the time.

9

Parents, in order for children to have continuity in their education, they must actually be attending school. The evidence established that Father is better able to ensure the Children's attendance, and the Court consequently weighed Factor 4 in Father's favor.[20]

The Court viewed Factor 5 as neutral between the parties. Both parents have extended family. Nothing about the Court's custody decision threatens or jeopardizes the Children's relationships with extended family, as they will continue to have opportunities to see their relatives.

The Court viewed Factor 6 as neutral. The Court did not establish different custody schedules for separate children. The three siblings will continue to be raised together.

The Court did not weigh Factor 7 in either Parent's favor. The Court acknowledged the Children's stated preference to maintain the existing physical custody schedule, but concluded that some of their other preferences could not be achieved under the existing schedule. For example, A.M., the oldest child, clearly expressed the preference for the conflict between her parents to end and demonstrated the insight to explain that her parents needed rules to follow to

---

[20] *See* Tr. 289-305 (April 4, 2018) (Father's testimony), Tr. 241-248 (April 23, 2018) (Mother's testimony), Father's Exhibits 52, 57, 59, 61, 65 (official school attendance records); Mother's Exhibit P (self-created summary that the Court finds less reliable than official record).

reduce the conflict.[21] J.M. very much enjoys going with Father to assist Father in his work as a real estate appraiser, an activity Mother believes inappropriate for J.M.[22] A.M. enjoys attending her brothers' sports practices and games, again something to which Mother objects.[23] J.M. expressed as his strongest wish that he get to all his baseball games, and asked if the Court could ensure that happens.[24] Again, Mother objects to the boys' current levels of participation in baseball and soccer. The Court found all of these preferences reasonable, given the Children's ages, but concluded that awarding primary physical custody to Father would better foster fulfillment of those preferences.[25]

The Court weighed Factor 8 in Father's favor. The Court heard credible testimony that Mother talks negatively about Father in front of the Children and uses material items she can afford, but Father cannot, in an attempt to turn the Children against Father. For example, on one occasion, Mother arrived at Father's house during his custody time to show the Children all of the new clothes and shoes she had purchased for them. Mother then informed the Children they could

---

[21] Tr. 72 (May 15, 2018).
[22] Tr. 33 (May 15, 2018).
[23] Tr. 75 (May 15, 2018).
[24] Tr. 39 (May 15, 2018).
[25] As the Court commented when stating the findings on the record, when considering the Children's preferences, the Court placed the greatest weight on A.M.'s insight regarding the conflict between Parents and the need for it to end. *See* Tr. 13-14 (May 17, 2018).

11

not have their new items while they were at the Father's house, causing the Children to cry.[26]

The Court weighed Factor 9 in Father's favor, although the Court noted that both Parents need to make changes in their behavior to ensure that the Children's emotional needs are met. The record supports that Father shows the capacity to reflect on his own behavior, to recognize its impact on the Children, and to alter his behavior accordingly. For example, Father acknowledged that he both needed and immediately sought his therapist's assistance in addressing the way he interacted with J.M. after Father's discovery that J.M. was aware of the plans to advance him a grade and participated in the failure to disclose that to Father.[27]

---

[26] Tr. 248-251 (April 4, 2018); *See also* Tr. 57-59 (April 13, 2018) (Mother insists on taking A.M. to orthodontist to get braces off when she knows office will refuse because Father's payments are not yet current), Father's Exhibit 111; Tr. 123-124 (April 13, 2018) (Mother makes unnecessary police report when Children are not answering phone because they are sledding with Father), Father's Exhibit 150; Tr. 137-138 (April 13, 2018) (Negative impact on Children of Mother requiring Father to pick them up from pool), Father's Exhibits 161-163.
[27] Tr. 274-275 (April 4, 2018), Father's Exhibit 42.

TJO                    12

In contrast, Mother has shown no similar capacity. One striking example of Mother's inability to attend to the Children's emotional needs arose during the testimony of Dr. Moodley, the specialist who treats A.M. for her Postural Orthostatic Tachycardia Syndrome (POTS). At Mother's request, Dr. Moodley read into the record the notes from a consulting psychologist associated with Dr. Moodley. These notes characterized the "family dynamics related to parents' divorce" as "negatively impacting [A.M.'s] health." The notes further identified A.M.'s "tenuous relationship with her mother" as "negatively impacting" her adherence to needed daily medication, and specified that "mother's approach of yelling creates a resistance to taking medication."[28] A.M. herself, describing the same appointment with the psychologist, reported that Mother devoted the majority of the appointment to speaking about her own issues with the divorce and with Father, until the psychologist intervened to request time with A.M. alone.[29]

The Court weighed Factor 10 in Father's favor. Unfortunately, the record contains many examples of Mother's inability to maintain civil interactions with health care professionals, school professionals and in other settings that are

---

[28] Tr. 92, 100-101, 103-104 (April 13, 2018).
[29] Tr. 84 (May 15, 2018). *See also,* Tr. 68 (May 15, 2018) (A.M. reports resorting to "fake crying" to get Mother to stop engaging in yelling and screaming arguments with A.M.).

13

important components of the Children's lives.[30] As the Court explained on the record, a parent, such as Mother, who cannot maintain basic civil conduct with the various systems that interact with her children cannot possibly attend adequately to their daily needs.

Father, on the other hand, appears more capable of conducting himself rationally and more capable of setting aside anger at Mother's conduct to focus on the Children's needs. For example, for several months toward the end of the 2015-16 school year and prior to the start of the 2017-18 school year, Mother unilaterally advocated and then arranged for J.M. and S.M. to be moved up a grade level. Mother brought in the assistance of an educational specialist employed by the Allegheny County Department of Human Services to assist her. When Father first became aware of Mother's efforts and the specialist's involvement, he was angry.

---

[30] *See, e.g.,* Tr. 72-74 (April 4, 2018) (School district communication policy routing Mother's communications through administrators due to teachers feeling intimidated); Tr. 111-115 (April 4, 2018) (Mother's communication with T-ball coach and potential negative impact on S.M.); Father's Exhibit 121 (Pediatrician office note referring to Mother's "erratic" behavior and use of "obscenities"); *Compare* Father's Exhibits 79, 80 (showing each Parent's respective response to same email from J.M.'s teacher).

However, rather than entirely rejecting their advice, he accepted input from the specialist who interacted with him and found the assistance beneficial enough that he would re-institute their services now.[31]

Factor 11 was not applicable, Parents reside in close proximity.

The Court weighed Factor 12 as neutral between the parties. Each parent is quite available to attend to child care duties. Mother does not work, and Father works from a home office. Each parent is capable of making appropriate child care arrangements when necessary.

The Court weighed Factor 13 in Father's favor. The evidence on this factor, more than any other, drove the Court to award sole legal custody to Father. The record demonstrates an extremely high level of conflict between Mother and Father. The evidence also compelled the Court to conclude that Mother's conduct and adamant unwillingness to accept Father's exercise of his parental role constitutes the source of much of the conflict. The record is replete with examples of Mother causing unwarranted conflict with Father. The evidence shows that

---

[31] *See generally,* Tr. 21-23, 180-181, 186, 280, 287-289 (April 13, 2018), Tr. 141 (May 15, 2018).

Mother is too wrapped up in her disdain for Father to make decisions that are in the best interests of the Children.[32]

Further, Father has demonstrated at least some ability to cooperate with Mother and consider her views. In contrast, the record is devoid of any examples of Mother agreeing with or compromising with Father, and Mother herself could not think of a single example where she considered Father's view on an issue and changed her viewpoint in response.[33]

The Court did not consider evidence related to Factor 14 significant enough to affect the Court's conclusions. The Court noted concerns raised in the custody evaluator's report regarding Mother's alcohol consumption, but did not reach any conclusions about this concern.

The Court did not consider evidence related to Factor 15 significant enough to affect the Court's conclusions. Mother has experienced some significant physical health conditions in the past, but these do not pose major issues now. The Court noted its agreement with the custody evaluator's observation that Mother

---

[32] *See e.g.,* Father's Exhibit 27 (Father attempts to discuss affordable health care options with Mother and Mother responds "F*** you!"); *See also,* Father's Exhibit 28 (Father attempts to discuss the Children's school and Mother responds "You are a soulless scumbag."); Father's Exhibit 32 (Father did not agree with Mother unilaterally changing the custody order and Mother responded "here is the deal, you are going to change your f***ing attitude or I'm gonna make your life a living hell."); Father's Exhibit 94 (Father reaches out to co-parent when it comes to medical appointments and Mother responds "Your (sic) liar. You say the most bizarre things regarding the kids heath (sic). Bizarre about everything... your (sic) not mentally right. Please seek help and work [o]n yourself!").
[33] Tr. 108 (May 15, 2018).

16

lacks insight. However, the Court's observations regarding this factor did not drive the Court's conclusions regarding the Children's best interests.

The Court found Factor 16 not applicable.

Considering all the factors, the Court found it necessary to award sole legal custody to Father. The Court further concluded that awarding Father primary physical custody by altering the school year custody schedule would best serve the Children's needs. Among other things, the Court concluded that school attendance issues and some frequent day-to-day conflicts regarding the Children's attendance at sports practices and games would be either eliminated or at least best addressed by awarding primary physical custody to Father. The Court further concluded that these issues were most pressing during the school year. Consequently, the Court maintained the equally shared physical custody schedule for the summer.

**B. Mother has failed to identify any abuse of discretion or legal error that warrants        reversal.**

1. Mother's specific complaints regarding the Court's findings do not merit relief.

Mother's first error alleges that the Court erred in awarding Father sole legal custody of the Children. Mother's second error alleges that the Court erred in awarding Father primary physical custody of the Children. The Court refers to its discussion above regarding the record support for its findings, weighing of the evidence, and ultimate conclusions. Where Mother

has identified specific sub-errors, the Court will now provide additional discussion, if needed.

In her first sub-error, Mother asserts that the Court erred in finding that Mother discourages a relationship between Father and the Children. The Court interprets this as a challenge to the Court weighing Factor 1 in Father's favor and does not believe further discussion of this factor is necessary.

In her second sub-error, Mother asserts that the Court erred in "finding that Mother performed most of the parental duties but weighing this factor in favor of Father, anticipating that he is capable of performing the same." The Court interprets this to challenge the Court's weighing of Factor 3. As discussed above, the Court clearly stated that it weighed this factor in favor of Mother, not Father.[34] Therefore, Mother's assertion that the Court erred in this respect is without merit.

In her third sub-error, Mother claims the Court erred "by first finding that the factor of stability was not pertinent in this case except for later inappropriately weighing the factor against Mother for school absences." The Court interprets this as a challenge to its analysis of Factor 4. At no point did the Court find this factor

---

[34] Tr. 10 (May 17, 2018).

TJO     18

to be "not pertinent."[35] The Court did, however, weigh this factor in favor of Father, for the reasons discussed above.

In her fourth sub-error, Mother alleges the Court erred "by giving Father school choice authority under circumstances that made Woodland Hills not in the best interest of the Children." The Court interprets this as a challenge to its award of sole legal custody to Father, as Father's authority necessarily includes all educational decisions, including choice of schools. The Court's discussion above explains its decision to award sole legal custody to Father. Regarding school choice in particular, the Court believes Mother so invested in her hatred of the Woodland Hills School District that she is incapable of recognizing ways in which the Children's current schools are suited to their needs and interests.[36]

In her fifth sub-error, Mother alleges the Court erred by not considering the well-reasoned preference of the Children regarding the physical custody schedule. The Court's discussion above explains the Court's consideration of the Children's preferences. The Court simply adds here that other factors outweighed the Children's preference regarding the physical custody schedule.

---

[35] See Tr. 10-11 (May 17, 2018).
[36] See, e.g., Tr. 96-97 (April 4, 2018) (School district observation that J.M. and S.M. thriving and adjusted at school unless Mother is present); Tr. 149-151 (April 13, 2018) (Father's observations of S.M.'s enthusiasm about school); Tr. 56-61 (May 15, 2018) (A.M. describing activities and her love of her school).

19

In her sixth sub-error, Mother alleges the Court erred in finding Mother attempts to turn the Children against Father. The Court's discussion above regarding Factor 8 addresses this issue.

In her seventh sub-error, Mother alleges the Court erred in finding Father is more likely to maintain a loving, stable, consistent and nurturing relationship with the Children adequate to the Children's emotional needs. The Court's discussion above regarding Factor 9 addresses this issue.

In her final sub-error, Mother alleges the Court erred in finding that Mother is the "heavier source of conflict." The Court interprets this as a challenge to the Court's weighing of Factor 13. The Court notes that the level of conflict between the parties in this matter is unusually high. The parties lack the ability to agree on both basic and major decisions concerning the Children. Of all the custody factors, the conflict between the parties and their inability to cooperate on the most basic level weighed most strongly in Father's favor and in the Court's award of sole legal and primary physical custody to him.

### 2. The Court's Order appropriately implements the Court's conclusion that Father shall have primary physical and sole legal custody.

Mother's third error takes issue with numerous provisions of the May 25, 2018 Final Order of Court. The Court interprets Mother's sub-errors 3(a), 3(b), 3(c), 3(d), 3(e), 3(g), and 3(j) to dispute the Court's decision to award Father sole

TJO     20

legal custody. The Court interprets Mother's sub-errors 3(f), 3(h), 3(i), and 3(k) to challenge the Court's decision to award Father primary physical custody.

Trial courts must necessarily exercise considerable discretion in drafting the details of custody orders. Given the support on the record for the Court's award of sole legal and primary physical custody to Father, the Court believes the specific details in the order fell within the Court's discretion to fashion. Consequently, the Court will not further address 3(a), 3(c), 3(d), or 3(j), as the Court has already explained its legal custody analysis on the record with the parties present and in the discussion above. The Court will not further address 3(f), 3(h), and 3(k), as the Court has already explained its physical custody analysis on the record with the parties present and in the discussion above. The Court will, however, address 3(b), 3(e), 3(g) and 3(i) because Mother's complaints lead the Court to believe she is misinterpreting the Order.

Regarding sub-error 3(b), Mother alleges the Court erred in ordering that she should be prohibited from attending school events, such as parent-teacher conferences, unless authorized by Father. The Order actually states that Mother may attend these events. The Order provides that Mother does, however, have to leave the event if a dispute should arise between herself and Father. The Court finds it appropriate for Father to remain at the event should this occur, as Father

21

was awarded sole legal custody and is responsible for making all educational decisions.

The Court also believes that Mother is misinterpreting the Order in regard to sub-error 3(e). During the hearing, Father credibly testified that activities Mother wants the Children to participate in, such as skiing and golf, are not financially feasible. Father testified that if he was awarded sole legal custody, he would permit the Children to participate in activities important to Mother that he could personally not afford as long as Mother was willing and able to pay for these activities. As Father was awarded sole legal custody, the Court specified that he would be unilaterally responsible for selecting the Children's extracurricular activities. The Court did not discuss or alter the allocation of payment responsibility for activities Father selects for the Children, as this is already covered in the parties' child support order. However, the Court did clarify Father's sole legal custody right to condition his consent for the Children's participation in an activity Mother proposes upon Mother agreeing to pay for the activity. This seems reasonable to the Court, as Father would be acting within the scope of his legal custody authority to simply refuse to permit the Children to participate in these additional activities selected by Mother. The Order does not permit Father to sign the Children up for anything he desires and then make Mother solely

22



responsible for payment of these activities as Mother seems to allege in sub-error 3(e).

Mother's sub-error 3(g) alleges that the provision of the Court's Order requiring Father to consider Mother's input before making any legal custody decisions is too subjective to enforce. Again, the Court thinks Mother simply misunderstands the Order or perhaps the concept of sole legal custody. When the Court awarded Father sole legal custody, it conferred upon him the exclusive right to make all major decisions on behalf of the Children. Father could then legally make all of these decisions without Mother's input or consent. However, the Court ordered Father to inform Mother prior to making these decisions far enough in advance to allow Mother time to provide her input. The Court also ordered Father to make a reasonable good faith effort to consider this input. The Court included these provisions to serve as a mechanism for ensuring that Mother's opinion would be heard before major decisions were made, as Father has shown himself able to consider Mother's input. However, if the Superior Court finds this requirement too subjective to enforce, the Court suggests simply removing the requirement.

Finally, in sub-error 3(i), Mother claims that the Court erred "by sacrificing Mother's holiday time for Father's need for holiday time without real reason." As all other holidays in the order rotate annually, the Court assumes Mother is

23

referring to whose custody takes precedence when conflicts between Jewish and Christian holidays occur.

The parties and the Court discussed holiday traditions in depth so that both parties' religious holidays could be accommodated. The two potential conflicts identified were Easter and Passover, and Hanukah and Christmas. The Court ordered that if Easter and Passover conflicted, Passover would take precedence and Mother would have custody of the Children. The Court did this because Mother requested Passover take precedence over Easter and Father agreed that it should.[37] The Court ordered that if Christmas and Hanukah conflict, Christmas would take precedence so that Father will have custody for Christmas Eve and Christmas Day. Similarly, this was ordered upon the parties' agreement that Christmas should take precedence over Hanukah. Mother testified that Father loves Christmas Eve and Christmas Day with the Children, and that she would "trump that over Hanukkah ... [a]bsolutely trump that over Hanukkah."[38]

For the reasons discussed on the record and throughout this opinion, the Superior Court should reject Mother's error 3 challenging details of the Court's Order and custody determination.

> ### 3. The Court did not err in considering testimony from hearings held on motions presented while the full hearing was pending.

---

[37] Tr. 214 (April 13, 2018).
[38] Tr. 90 (May 15, 2018).

24

Mother's fourth error alleges that the Court erred in considering testimony from two motions hearings, asserting generally that the testimony was not sworn and that proper procedure was not followed. Mother is mistaken.

The Court admitted transcripts from two motions hearings into the record. The first hearing occurred on November 7, 2017 in response to an emergency motion Mother filed regarding the Children's grade level placement in their school district. The Court held a full hearing on this motion, in which Mother, Father, and both witnesses from the school district were sworn in. The second hearing occurred on January 5, 2018 in response to a motion Mother filed concerning the status of the Children's health insurance. Mother and Father were again both sworn in before the beginning of the motion hearing.[39]

The transcript from the November 7, 2017 motion was admitted to the record on the first day of trial at Mother's request as Mother's Exhibit A.[40] Mother now alleges that the Court erred in considering her own exhibit.

---

[39] For background, while this matter originated in January 2016, it was not assigned to the undersigned Judge until October 2, 2017, following two judicial recusals in September 2017. Mother quickly filed numerous motions in the month of October. Recognizing the highly litigious nature of the case, the Court began the practice of swearing the parties in and having every motion argued on the record. The Court made extensive efforts to accommodate Mother's numerous motions, including scheduling her motions at a different time than all other pro se motions so that she would have adequate time to address all of her issues.

[40] *See* Mother's Exhibit A; Tr. 79 (April 4, 2018).

The transcript from the January 5, 2018 motion was admitted as the Court's Exhibit 2 on the third day of trial in the interest of judicial economy after Mother began to rehash the payment history of the Children's health insurance premiums going back to 2016.[41] At the time of the custody hearing, both parties were acting pro se and were also involved in ongoing litigation concerning equitable distribution and child support. At times during the custody hearing, both parties sought to offer testimony that was pertinent primarily to the pending proceedings on financial issues. At the time of the custody hearing, the custody matter had not reached a final resolution in over two years. The hearing, initially scheduled for two days, was halfway through a third day, and it was apparent a fourth and potentially fifth day would need to be scheduled. Instead of devoting hearing time to Father's response to Mother's testimony about the health insurance, the Court chose to admit the transcript from the motion hearing in order to prevent repeat testimony on an issue that was primarily relevant to the parties' child support proceedings.

As the transcripts reflect, the testimony from these hearings was taken under oath, and the parties were both given the opportunity to question witnesses, submit evidence, and argue their respective positions. Consequently, the Superior Court should reject Mother's fourth matter complained of on appeal. Alternatively, the

---

[41] Tr. 123-129 (April 23, 2018).

26

Court posits that the testimony from these two transcripts played a minimal role in the Court's decision and any improper consideration of the testimony could amount to nothing more than harmless error.

Mother's fifth error alleges the Court erred by failing to specify the testimony the Court relied on from the motions hearings. The Domestic Relations Code requires the Court to "delineate the reasons for its decision on the record in open court or in a written opinion or order."[42] The Superior Court has held that merely listing the factors[43] or simply stating that the court considered the factors without further explanation[44] is insufficient under the statute. The Court does not interpret this to require the Court to detail each specific exhibit and piece of testimony it relied upon in reaching its decision. For further clarity here, the Court found the November 7, 2017 testimony illustrative of the parties' respective abilities to work with the school administrators and each other in order to meet the best interests of the Children. The January 5, 2018 transcript bore minimal relevance to the custody proceedings outside of demonstrating the conflict between the parties. Both transcripts played a minor role in the Court's overall custody decision. For these reasons, the Superior Court should reject Mother's fifth matter complained of.

---

[42] 23 Pa. C.S. § 5323(d).
[43] *M.P. v. M.P.*, 4 A.3d 950, 955-56 (Pa. Super. 2012).
[44] *C.B. v. J.B.*, 65 A.3d 946, 950-51 (Pa. Super. 2013).

27

### 4. Mother's remaining issue should be deemed waived for vagueness.

Mother's sixth matter complained of alleges that the Court "committed errors through various evidentiary rulings that cannot be specifically identified ... ."[45] The statement of this issue violates Rule of Appellate Procedure 1925(b)(4)(ii), which requires the appellant's concise statement to "identify each ruling or error that the appellant intends to challenge with sufficient detail to identify all pertinent issues for the judge."[46]

Pursuant to Rule 1925(b)(4)(vii), issues "not raised in accordance with the provisions of ... paragraph (b)(4) are waived."[47] The Pennsylvania Supreme Court has recognized that:

> [t]he absence of a trial court opinion poses a substantial impediment to meaningful and effective appellate review. Rule 1925 is intended to aid trial judges in identifying and focusing upon those issues which the parties plan to raise on appeal. Rule 1925 is thus a crucial component of the appellate process.[48]

"When a court has to guess what issues an appellant is appealing, that is not enough for meaningful review."[49] "In other words, a Concise Statement which is too vague

---

[45] *See* Concise Statement of Errors Complained of on Appeal, ¶ 6.

[46] Pa.R.A.P. 1925(b)(4)(ii). Pa.R.A.P. 1925(b)(4)(vi) provides an exception to this rule that permits general statements of errors *only* when the appellant cannot readily discern the basis for the judge's decision and prefaces the statement of matters complained of with an explanation as to why the errors are only in general terms. Such an explanation was not provided here.

[47] Pa.R.A.P. 1925(b)(4)(vii).

[48] *Commonwealth v. Lord,* 719 A.2d 306, 308 (Pa. 1998).

[49] *Commonwealth v. Dowling,* 778 A.2d 683, 686 (Pa. Super 2001) (quoting *Commonwealth v. Butler,* 756 A.2d 55, 57 (Pa. Super. 2000)).



28

to allow the court to identify the issues raised on appeal is the functional equivalent of no Concise Statement at all."[50] The Superior Court has held that "[e]ven if the trial court correctly guesses the issues [a]ppellant raises on appeal and writes an opinion pursuant to that supposition, the issue is still waived."[51]

Unfortunately, with over 1000 pages of testimony contained in the transcripts, and over 200 admitted exhibits, the Court is unable to even muster a guess as to what potential evidentiary errors Mother may be complaining of and therefore cannot elaborate on the issue. The Court therefore suggests that this issue is waived.

## V. Conclusion.

For the reasons detailed above, the Superior Court should reject Mother's issues for review and affirm this Court's May 25, 2018 Final Order.

By the Court:

The Honorable Eleanor L. Bush

---

[50] *Id.* at 686-687.

[51] *Commonwealth v. Heggins*, 809 A.2d 908, 911 (Pa. Super. 2002) (citing *Commonwealth v. Lemon*, 804 A.2d 34 (Pa. Super. 2002).

29